Can I please have the Court? I'm Patty Risperger, representing the plaintiff. Can you pull the mic a little closer? I'm going to be speaking to the mic. Is that better? The issue in this case is whether there are genuine issues of material fact that defendants acted with improper means or motive in falsely representing to plaintiff's employer that plaintiff had failed to cooperate with defendants. And defendant concedes in their response brief that to survive summary judgment, plaintiff must produce a set of facts showing dishonesty or bad faith. I'll go into the facts just briefly for background. Nelson, the plaintiff, had a written employment agreement with Westcole under which he could only be fired for cause. Ham Street and Glass were aware of this ongoing employment relationship. As the general manager, Nelson directly reported to the president, Randall, and only informally to the board. Glass assesses the financial state of struggling enterprises and sometimes assumes control of operations or assists in the sale of enterprises. Westfall and Ham Street were Glass employees. On December 3, 1999, Westcole retains Glass because they wanted a consultant to help the company become more profitable. It's undisputed in the record. You know, you only have ten minutes, and I think you should get right down to the issue. I think we know what the facts are. The real issue here is, did the consultant use any improper means, right? Correct. That's the issue. And what are the improper means they used? The improper means are the misrepresentation made by the consultant to Youngren, who is the board of directors. And what was the misrepresentation? That Mr. Nelson was not cooperating with the board and with Glass. Are those the words that the consultant used, not cooperating? Yes, and that's in the record, Your Honor. At the excerpt of record, page 53. This is whose testimony? Ham Street's testimony. Ham Street. Ham Street. He reached the quote and he calls it an important conclusion that Nelson was not cooperating with the board. And he reported it because it was so important to him. Where are you reading from? What page did he say that? Believe it's the excerpt of record at page 53. This is whose. Ham Street. Go ahead. Go ahead. Well, let's just assume that. And can I just add one thing? I believe it's also I have two pages, page four as well, but 54 and four is where it can be found. It's also at excerpt of record, page six. Well, I'm having difficulty understanding what was a misrepresentation about that. Mr. Henry expressed an opinion that he wasn't fully cooperating. But at the time, Nelson said, you know, you can't have access to the documents. You can't have access to the controller. And you've got to give me a list of the mechanics that you want to talk to. And I've got to consult with a lawyer. And I'll if you come when you do all those things, then I'll agree maybe to give you the documents on Thursday. So what is in it sort of intentionally fraudulent about telling youngstern exactly what happened? The intent, the fraudulent part of that is that and as we see from the Buckner case, there are facts that can be assumed from even statements of opinion. I understand. But what about what I've just related is even untrue? The portion that he was hesitant or that somehow he didn't want to produce these documents. Well, he said he didn't. No, he didn't. He didn't say he didn't want to. He said, I want a list. And I don't know why you can't infer from that that he wasn't being totally forthcoming. Because that is doing exactly what you can't do on summary judgment. That is viewing the evidence in the light most favorable to the defendant. But what reasonable inference can you draw from from those facts? The reasonable inference you can draw is that and if you look at supplement of record at page 37, there is a report. There are several reports being made about Nelson, not just one phone call. There are several reports that were made repeatedly. In fact, he was put on administrative leave. What do you mean by several reports? It's written or oral. Well, if it doesn't say we have a resolution that states all shareholders of West Coal Inc. held a special meeting on December 7th. And I'm looking at at exhibit four to Jerry Nelson deposition at supplemental excerpt of record 37. They received a report. And this is the resolution. This says they received a report from counsel for the corporation regarding the repeated refusal by Randall. That's from the council. It's not from the consultant. Who else could the report have come from? You said they received a report from counsel. You know what you just said? That's what I just said. But how does that matter? Just a minute. That's not a misrepresentation by the consultant. It's evidence of a misrepresentation. The misrepresentation, the misrepresentation is that Younger is being led to believe that Nelson is preventing glass from doing their job. That they can't do their job because of the fault of Nelson. And there might be an inference that the young younger and younger and younger and grew. But what Judge Raman and I are both trying to get at was what misrepresentation was that based? That conclusion based on what did, you know, glass say that was false or fraudulent? That Nelson was operating a charade. The word charade is used directly in by Ham Street himself. He thought it was a charade. He said that to Younger. And I think he said that in his deposition as part of his testimony. But there's no evidence that he ever said that to Younger. He did, Your Honor. But if you don't know where he said that, there are direct questions being asked. And the way Younger in response to those questions or excuse me, the way Ham Street responds to those questions to direct questions is to come up with this. Gee, my thought process may processes may have been and you can infer that if those were his thought processes and there's evidence in the record that there are repeated reports being made about Nelson, that he conveyed his thought processes to Younger. It's very clear to me that that these two Ham Street and the other guy. I mean, they did have the impression that Nelson was not cooperating. And I think I can see how they came to that, came to that impression. But, you know, all they're doing is conveying their opinion to to the board. This is what we believe he's doing. But it's a bad thing. Besides being an opinion, you know, it really is based upon fact. And how can that be a misrepresentation? Because it's a false fact that it's based on. The fact that it's being based on is that there's a charade going on. And he uses this word charade and he uses the word stonewalling in his deposition. But he didn't tell that to Younger. He's not admitting to it, but he's also saying he doesn't remember what he said. Yeah, but there's no evidence that that's what he told Younger. The evidence is that there's a document stating there were repeated reports about about not cooperating. And now Ham Street himself says, if this happened in my company, I would just terminate this guy on the spot. And in fact, he's placed on administrative leave the next day. If you've been told by the chairman of the board that somebody is coming and you're supposed to coming to visit your office and you're supposed to cooperate with them and the first thing you do is tell them, sorry, I need to consult my lawyer and I'm not going to give you access to the controller, to the mechanics or to any documents without a list. I think it's a fairly fair inference that you're not cooperating. You know, that's one reading of the record, Your Honor. And we give you that. However, there's another reading of the record, and that is that there was bad faith here because on the next day he's put on administrative leave for following what his own attorney told him to do. And I have 40 seconds, so I'm done. Okay. All right. Then we'll hear from Sandra. May it please the Court. Courtney Angeli of Stull Reeves on behalf of defendants Glass and Associates and Clyde Hamstreet. As I think the Court has tuned into, the central problem with plaintiff's case is that there's no facts that show or allow a reasonable inference that Glass's representative, Mr. Hamstreet, believed his statements to Mark Youngren to be false as opposed to their being potentially factual. Well, you don't have to believe it. I mean, it just has to be, you know, a reasonable person would have believed that, that, you know, they weren't true under the circumstances, right? I think that's correct. But I think that the fundamental distinction is between something that's just factually erroneous and something that's wrongfully reported. I don't believe that a person can be said to have. Well, what about the point the plaintiff makes that we have to draw all the inferences? You know, these are, I think, ambiguous statements. But all the inferences from those ambiguous statements in favor of the plaintiff with the opponent on summary judgment. That's correct. But you only draw reasonable inferences. And so I think what is helpful is to look at kind of the key facts and figure out where you get from those with some reasonable logical process. Hamstreet understood from Youngren that arrangements had been made by Westcold, that local management was expecting them. The contract that was signed between Westcold and Glass provided explicitly that Glass shall have full access to all personnel, books, records, and financial plans. And the contract also said that Glass would report to the board with no oversight or review by any other person. And then despite the notice provided to plaintiff by Mr. Youngren, plaintiff refused to provide any documents without first receiving specific authorization, which is his wording, and a specific list, which he said he then had to review with the company's outside attorney. And he refused to make any employees available for interview. In light of the obvious disconnect between Mr. Hamstreet's expectations and what he encountered, it's not reasonable to find in the statements that he then made to Mr. Youngren some kind of- Well, Hamstreet was under, first of all, under the mistaken impression that Nelson was a CFO, right? Which he wasn't. Well, it's kind of unclear what his position was. He said he was general manager, but he said that he was the person who had oversight of the financial records. Well, and then, you know, I think Nelson rightfully, when they first came in or the first contact he had, he said, well, you should talk to the president, right? Or these are matters for the president to take care of. And, you know, the things he did, well, I suppose they weren't the most cooperative. I don't think it's proper to view them if you draw the inferences in the plaintiff's favor. It's stonewalling, right? I mean, he said, one, I'm not the president. You've got to talk to the president. One, I'm not the CFO. One, you know, this is not my bailiff, so I want to talk to my lawyer before I give you papers. Those all seem to me reasonable actions. To talk to the company's outside counsel? Yes, when a stranger comes in and says, you know, I want to see all your papers. He says, well, give me a written list and I'll show it to my lawyer. That's reasonable. Wouldn't you like your client to do that for you? More work. If a stranger walked into the office and said, I want to see all your papers? Well, I think that ignores the fact that Mr. Youngren, the chairman of the board, had called the plaintiff earlier that day and said someone will be coming in to do an outside review. And what did the plaintiff say? Well, gee, you ought to talk to the president. Correct. But then he fails to mention that to the president. I think that it's important to look at the message that Youngren understood on the basis of Hamstreet's statements to him. And Mr. Youngren said that Mr. Hamstreet told him that plaintiff, quote, was kind of ambivalent and it wasn't 100% cooperation like, okay, I know you're here, I know what you're here for. But it was kind of an apprehension of cooperating with Glass. He didn't say anything about stonewalling. The message that went to the board was incredibly accurate in light of plaintiff's own testimony about how he felt when he came in. And there's been some suggestion in the briefing that plaintiff was somehow tarred with the bad actions of the president who, you know, threw these people out summarily. But I don't think that that is a reasonable inference either. The record is clear that at SER 18 that Clyde Hamstreet told Youngren it was Randall who initially threw them out. And at that point, Hamstreet and Westphal had not even seen or encountered Mr. Nelson. So there's no reason to believe that he would have somehow included plaintiff in that action. And it's also undisputed that Hamstreet made clear that plaintiff had agreed to provide documents to him by Thursday. Mr. Youngren understood that and he then conveyed it to his fellow board member, Julie Kopp. Mr. Hamstreet also testified that he was sure he told Youngren that plaintiff is the one who gave them the list. So it's not, I mean, again, he gave clear indication to the board that plaintiff was cooperating in some fashion, albeit with this slight hesitance. There's just no place where plaintiff's recounting of the events deviates substantially from the information that Mr. Hamstreet conveyed. I want to just talk a bit about the cases. There's nothing that's absolutely on point, but I do think that this case is distinguishable from those pointed to by plaintiff. In the Volm versus Legacy Health case, there was clearly, in that case, a total campaign against the plaintiff. And the opinion isn't terribly detailed in the facts, but it indicates that the interfere in that case conveyed some incorrect information. And that's different from here. Moreover, here, Hamstreet and Glass had a contractual obligation. I think that's central to the analysis in this, to report their conclusions to Youngren. In Volm and in every other case cited by plaintiff, it's clear that a lot of the comments that were being made about the plaintiff were just kind of peanut gallery gossipy comments. They weren't pursuant to any contractual obligation. They weren't authorized by anybody, and they certainly weren't part of any legal obligation. And it seems to me in all these cases, Volm, Petrovsky, and Buckner, that's a central issue. And even if the court didn't rule on this, the district court didn't rule on the issue of privilege, but it seems to me the most logical way, even if you could draw inferences, for sake of argument, imagine you could draw an inference that got you potentially to some kind of evidence of wrongful means or wrongful motive. The privilege analysis allows you to go beyond that and impose common sense on the situation and review all the facts and circumstances. And it seems extremely important that Glass was acting under this contract that did specify that they were to report only to the board, and it did give them unfettered access to the books and that they were acting on. And so they had a duty to act, and to the extent that they incidentally interfered in some fashion with plaintiff's employment, that incidental interference is essentially trumped by their own contract. That's the Birkenwald v. Hoobline case, Washington Court of Appeals case from 1989. In that case, the court said when one acts to promote lawful economic interest, bad motive is essential and incidental interference will not suffice. Here, plaintiff admits that even under his view of the situation, Glass was motivated by financial self-interest. He thinks that they wanted to come in and at a high hourly rate run the business. And it's this recognition that it's legitimate to have economic motives that should, I think, dispose of this case. And also, under the Plumbers and Steamfitters v. Washington Public Power Supply System, a Washington Court of Appeals case from 1986, the court granted summary judgment on the basis of the privilege, stating that even if all of the elements of the intentional interference tort are present, interference is justified as a matter of law if the interferer has engaged in the exercise of an absolute right equal or superior to the rights which was invaded. And here there is that contractual right. And it's plain that any shadow that was cast over the plaintiff's employment as a result of Clyde Hamstreet reporting accurately his perceptions of what he encountered at Westcold is privileged and it results in purely an incidental interference with that right. The restatement provision on this is also important, and it recognizes that a person can effectively interfere in a relationship in a justified fashion if the advice, if he's doing so giving advice. So for all these reasons, the district court's opinion should be affirmed. Thank you. Thank you. Counsel? Thank you. Your Honor, there is no evidence here that Nelson was doing anything uncooperative. The meeting that these folks had took about an hour. He told them that when you get me a list, we'll provide the documents. Our payroll or our bookkeeper isn't here. He just couldn't provide the documents. There's no evidence that there was anything uncooperative. And what Glass set up here was Nelson being bootstrapped onto the termination of Randall. They're terminated on the same day for the same reason. There was a bootstrapping, which indicates bad faith. And the bad faith is these folks are trying to, Glass is trying to get everybody out all at the same time. Sorry. Thank you very much, both of you. The matter just argued will be submitted. And we'll next hear argument in Sicardi v. Mailwell. Lyle? May it please the Court, Sean Lyle on behalf.
judges: Rymer, Tashima, Weiner